**Jimmy JACKSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69612.

Court of Criminal Appeals of Texas, En Banc.

Sept. 19, 1990.

Rehearing Denied Nov. 20, 1991.

Bob C. Hunt, Houston (court appointed), for appellant.

John B. Holmes, Jr., Dist. Atty., and Roe Morris and Joe Magliolo, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TEAGUE, Judge.

A jury convicted appellant, Jimmy Jackson, AKA Johnny Ray Carter, of capital murder under V.T.C.A. Penal Code, § 19.-03(a)(2). The jury answered in the affirmative each of the three special issues that were submitted to it. See Art. 37.071, V.A.C.C.P. Consequently, the trial judge sentenced appellant to death. Appeal to this Court is automatic. See Article 37.071, supra. At the time of the commission of the offense, appellant was only 17 years of age.[1]

Appellant does not challenge the sufficiency of the evidence, either as to his guilt or to the affirmative answers to the special issues. The facts show that on July 6, 1985, Robert Lee Brown, the deceased, was a taxicab driver in Houston. He was robbed and shot five times, with four of the shots striking him in his face and temple, and one striking him in the shoulder.

Death resulted from the one shot to his temple. Appellant gave two statements to the police in which he admitted that he pointed a gun at Brown's head and told Brown that he was going to rob him. Appellant stated that Brown reached over and tried to take his gun from him, during which struggle he shot Brown.

At the punishment stage of the trial, the State proved that when appellant murdered Brown, he, appellant, was on probation for burglary. James Jackson, another taxicab driver, but no relation to appellant, testified that on July 4, 1985, appellant and another man got into his taxicab, after which appellant placed a gun at Jackson's head, robbed him, and forced him to get inside of the trunk of the taxicab. After the taxicab crashed into a house, people inside the house came out and got Jackson out of the trunk. Appellant avoided capture.

Theodore Williams, another taxicab driver, testified at the punishment hearing that on the same day as the Jackson robbery, July 4, 1985, appellant and another man robbed him. Appellant's companion pointed a gun at Williams while appellant looked for money in the front seat of the taxicab. Williams told them he did not have any money. Appellant found money in William's pockets and told his companion to shoot Williams, but his companion did not do so. After also taking Williams' gold chains and watch, the two fled.

In the evening of the day appellant murdered Robert Brown, appellant and another man flagged down Harmony Agugua, another taxicab driver. After directing Agugua to a dead-end street, the two demanded Agugua's money, which he kept in the trunk of his cab. Appellant stood behind the trunk and as Agugua got out of the car and walked back toward the trunk of the car, appellant shot him in the leg. Although Agugua had been shot in the leg, he successfully managed to escape and get help.

---

1. V.T.C.A., Penal Code Section 8.07(d) expressly prohibits the State from executing anyone who was under the age of 17 years at the time the offense was committed. Thus, as a matter of State law, the voters of Texas have expressed their feelings that executing someone who is over 17 years of age is not cruel and unusual punishment.

Appellant was arrested on the night of July 6, 1985, after the shooting of Agugua. At the time of his arrest he possessed a revolver and 39 rounds of ammunition.

The State also offered evidence showing that from the time of his arrest in July, 1985, through trial in early 1986, appellant was transferred numerous times within the Harris County jail because he fought with other inmates. He was placed in administrative segregation, by himself, because he was considered a threat to the general jail population. Appellant also threatened to kill Edward Donald Miles, one of the deputies who testified against him at the punishment phase. The State also introduced evidence that during the trial of the case appellant possessed a handmade knife.

The only evidence appellant introduced at the punishment phase of the trial were the two statements he had made to the police concerning the instant case in which he stated that Brown struggled with him, during which struggle appellant shot Brown.

In his first two points of error, appellant asserts that the Texas capital murder scheme is unconstitutional because it applies to defendants who are 17 years of age at the time the capital offense was committed.[2] Appellant contends that because he was 17 years old at the time of the offense his age alone should bar imposition of the death penalty as cruel and unusual punishment under either the Texas or United States Constitution. We disagree.

In *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the United States Supreme Court held that imposition of the death penalty on an individual who was 16 or *17* years-old at the time of the commission of the offense does not constitute cruel and unusual punishment under the Eighth Amendment. Thus, appellant's claim under the United States Constitution is without merit. Compare, however, *Thompson v. Oklahoma*, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).

■ In *Ferguson v. State*, 573 S.W.2d 516 (Tex.Cr.App.1978), this Court stated,

without direct reference to either the Texas or United States Constitution, that the death penalty was not unjust for a 17 year-old in light of the facts of the offense. Appellant also acknowledges this Court's decision in *Barney v. State*, 698 S.W.2d 114 (Tex.Cr.App.1985), in which we stated that a defendant's youth alone will not prevent the imposition of the death penalty. See also *Livingston v. State*, 739 S.W.2d 311 (Tex.Cr.App.1987), and *Cannon v. State*, 691 S.W.2d 664 (Tex.Cr.App.1985). In these cases, this Court upheld the imposition of the death penalty by stating that youth alone will not prevent imposition of the death penalty. In light of these cases and *Stanford*, we reaffirm what has been at least implicit in our past decisions, that an individual who was above the age of 17 when he commits the offense of capital murder may be sentenced to death without offending constitutional provisions concerning cruel and unusual punishment.

■ Appellant also argues that because there is nothing within Art. 37.071, supra, that authorizes jury consideration of a defendant's youthful age as mitigating evidence, the statute is unconstitutional. He argues that the special issues do not allow for consideration of the age of the defendant. We disagree.

In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), the United States Supreme Court held the Texas capital murder statute unconstitutional "as applied" in the face of a challenge based upon lack of additional instructions concerning mitigating circumstances. The mitigating factors at issue in *Penry*—mental retardation and child abuse—are not present in the instant case.

In *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion), the defendant requested a special instruction at the punishment phase for the jury to give consideration to evidence showing that he had no record of disciplinary violations while incarcerated awaiting trial. The *Franklin* plurality held that "petitioner was accorded full op-

---

2. See footnote 1, *ante.*

portunity to have his sentencing jury consider and give effect to any mitigating impulse that petitioner's prison record might have suggested to the jury as they proceeded with their task." *Id.* 108 S.Ct. at 2329.

■ Although we agree with appellant that there is no express requirement within the provisions of Art. 37.071, supra, that provides for a special instruction regarding a defendant's youthful age as a mitigating factor, we also find that there is nothing within the statute that might prohibit the jury from considering a defendant's youthful age in answering the second special issue, or the probability question. See Art. 37.071(b)(2), supra. Age, however, is a factor which we find may be considered by the jury in answering the second special issue. In this instance, we decline to engraft onto Art. 37.071, supra, the requirement that a special instruction, if requested, should be given the jury regarding a defendant's youthful age. Appellant's first two points of error are overruled.

In his third point of error, appellant claims that the prosecutor's questions asked of three venirepersons concerning their beliefs as to the effects of rehabilitation in answering the second special issue constituted a misstatement of the law, requiring reversal.[3]

Appellant argues that the prosecutor was improperly permitted, over his objection, to inform these venirepersons that the issue of rehabilitation was not germane to the resolution of special issue number two, or the probability question.

The record reflects that the prosecutor discussed the Texas capital murder scheme and the three special issues with venireperson Ronald Rook.[4] Then, defense counsel asked Rook about an answer he gave apparently to a question included on a questionnaire given to the veniremembers. Rook indicated that he thought the Texas Department of Corrections, now the Texas Department of Criminal Justice, Institutional Division, could rehabilitate inmates. The prosecutor followed up on that remark:

[PROSECUTOR]: You mentioned rehabilitation with Mr. Hunt. [Defense counsel]. Is it clear that if the answer to Special Issue No. 2 you believe was proved yes beyond a reasonable doubt, even though you may have some thoughts of rehabilitation and even though you may think down the road he could be rehabilitated, you still have to answer—

[DEFENSE COUNSEL]: That's not necessarily true, Your Honor.

THE COURT: Do you have an objection?

[DEFENSE COUNSEL]: Yes, that's a misstatement of the law.

THE COURT: Rephrase.

[PROSECUTOR]: I have to prove Special Issue No. 2 beyond a reasonable doubt even though sometime in the future you believe he may or possibly could have been rehabilitated, you still have to answer Special Issue No. 2 yes.

[DEFENSE COUNSEL]: Object to that. That's a misstatement of the law.

[PROSECUTOR]: If I prove it I must—

[DEFENSE COUNSEL]: If he believes the rehabilitation happened prior to anything, then he could answer it no.

THE COURT: Objection overruled.

[DEFENSE COUNSEL]: Note our exception to the Court's ruling.

[PROSECUTOR]: Did I make myself clear? Let me repeat it. If I prove to you that number two beyond a reasonable doubt should be yes and even though you have some thought about rehabilitation or maybe you think 20 years down the road he might be able to be rehabilitated but before that 20 years was up there would be a probability that the defendant would commit criminal acts of violence that would constitute a

---

3. Appellant states that the prosecutor repeated this objectionable proposition to ten venire members, but appellant specifically contests only the questioning of three of those ten venire members because he did not object to the other seven. We will address only those three.

4. This venire member's name is spelled "Rook" and "Roak" in the statement of facts. We will spell it Rook, except where it appears differently in an excerpt from the record which we have put in this opinion.

continuing threat to society, you would have to answer it yes?

[ROOK]: That's correct.

\* \* \* \* \* \*

[DEFENSE COUNSEL]: You could possibly take into consideration that one could be rehabilitated, could you not, Mr. Roak, and answer question number two?

[ROOK]: I don't think that would be a proper thing for a juror to decide in a criminal case unless there was sufficient evidence to indicate that. I'm sorry, I'm not a criminal lawyer.

In a similar vein, the prosecutor discussed the issue with venireperson Patricia Scarborough:

[PROSECUTOR]: The word rehabilitation does not appear in Special Issue No. 1, 2 or 3. Conceivably you could feel that a person could be rehabilitated over the next 20 or 30 years but if you believe beyond a reasonable doubt there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to some society while he was being rehabilitated, then you would have to answer Special Issue No. 2 yes and he would receive the death penalty if you answered all the others.

[DEFENSE COUNSEL]: Misstatement of the law. She can take rehabilitation and I couldn't tell and everything into consideration and she doesn't necessarily have to answer it yes or any juror doesn't if they feel that one might be rehabilitated in the future.

[PROSECUTOR]: That's a misstatement of the law.

THE COURT: Overruled.

[DEFENSE COUNSEL]: Note our exception.

THE COURT: I don't understand the question. I got lost.

[PROSECUTOR]: Let's look to Special Issue No. 2.

[SCARBROUGH]: Okay. I understand the question.

[PROSECUTOR]: You might feel that person could be rehabilitated over the next five, ten, fifteen, twenty years. But you further believe that the answer to Special Issue No. 2 is yes beyond a reasonable doubt. You believe him to be a probability, not that he would but that there was a probability that he would commit criminal acts of violence that would constitute a continuing threat to society.

[SCARBROUGH]: While being rehabilitated.

[PROSECUTOR]: You understand in that situation you would have to answer Special Issue No. 2 yes even though you believe that he can be rehabilitated over the ten, twenty or thirty years; and if you answered the other two yes, he would receive the death penalty.

[DEFENSE COUNSEL]: Object to that. That's a misstatement.

THE COURT: Objection is overruled.

[DEFENSE COUNSEL]: Note our exception.

[PROSECUTOR]: You can answer that if I made it clear.

[SCARBROUGH]: I understand what you are saying in the course of rehabilitation a person might be a threat to those around him; and if I considered that to be the case based on the evidence, I would have to answer yes to Question No. 2.

[PROSECUTOR]: Right. Would you?

[SCARBROUGH]: Yes, if you convince me of those things.

The same issue was discussed with venireperson Mary Long:

[PROSECUTOR]: He [defense counsel] mentioned the word rehabilitation. Let me direct you to Special Issue No. 2. In theory, you could believe that a defendant could be rehabilitated if he is put—

[DEFENSE COUNSEL]: He says what his interpretation of the law is. This is not necessarily the law.

[PROSECUTOR]: I think it is good common sense and I would like to finish my sentence before he objects.

THE COURT: The objection is going to be overruled. You may proceed.

[DEFENSE COUNSEL]: Note our exception.

[PROSECUTOR]: If you believe a person could be rehabilitated over the next

10 or 20 years, but you further believe that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society, you would have to answer that special issue yes.

THE COURT: I'm going to have to stop you there. First of all, he has got to prove to you beyond a reasonable doubt that answer should be yes. You understand?

[LONG]: Yes.

THE COURT: Now, what you believe is one thing. But what he must prove to you is altogether maybe a different thing. It may be the same thing as what you believe but it could be different. You see what I am saying?

[LONG]: Yes.

THE COURT: If he proves it to you beyond a reasonable doubt, no matter what you feel, you got to answer it yes, if he proves it to you beyond a reasonable doubt.

[LONG]: I see.

THE COURT: Doesn't make any difference. If you are going to follow the law under your oath as a juror and that's where we really need to get it.

[DEFENSE COUNSEL]: She has to look at her own definition.

THE COURT: I am instructing this juror, Mr. Hunt [defense counsel]. I want you to keep that in mind.

[LONG]: Yes.

THE COURT: Go ahead.

[PROSECUTOR]: After laying that foundation, the question is what if you thought this man could be rehabilitated.

[DEFENSE COUNSEL]: Your Honor, that's not a proper question.

THE COURT: It may be a proper question. Let him finish.

[PROSECUTOR]: You think this man could be rehabilitated if he was put in the penitentiary 10 or 50 years but you further believe that I have convinced you beyond a reasonable doubt that the answer to Special Issue No. 2 is yes. Further you have answered one yes and you have answered three yes, so if you know you answered two yes, then he will re-

ceive the death penalty. You understand the setup? You believe that if he was in the penitentiary for let's say for 20 years, he could be rehabilitated but on the other hand you have answered one and three yes and I have convinced you beyond a reasonable doubt that the answer to number two is yes, could you go on and answer that yes irregardless of your feelings about him being rehabilitated some time down the line?

[LONG]: Yes.

[PROSECUTOR]: And you understand you would have to answer it yes if you are to follow the law?

[LONG]: Uh-huh.

Appellant argues that the prosecutor sought to commit jurors to the proposition that possible rehabilitation was not a consideration in answering special issue number two. Appellant contends that rehabilitation is a mitigating factor under special issue number two as to whether the defendant will continue to commit criminal acts of violence.

 Rehabilitation is obviously a proper consideration under special issue number two. See V.T.C.A. Penal Code, § 1.02(1)(B), which provides: one objective of the Penal Code is the rehabilitation of those convicted of violations of this code. The prosecutor did not tell the veniremembers that they could not consider rehabilitation under special issue number two. Rather, he essentially tried to commit them to his view of what a "continuing threat to society" meant under this special issue. Since that phrase is not defined, any impropriety in the questioning comes in limiting a juror's view of what constitutes a "continuing threat to society" to the prosecutor's definition. In that sense, appellant is correct that the prosecutor's discussion was a misstatement of the law because it limited a juror's discretion in evaluating what he or she considered to be "a continuing threat to society."

 Having found error in the voir dire, we must determine whether appellant was harmed by the error. See *Rougeau v. State*, 738 S.W.2d 651, 657 (Tex.Cr.App.

1987). Appellant states that he was denied a fair trial because such incorrect proposition of law by the prosecutor created doubt in the reliability of the affirmative answer to special issue number 2. Appellant argues, in essence, that mitigating evidence was presented so as to render the prosecutor's questioning harmful. According to appellant, the mitigating evidence was that the murder involved overtones of provocation, a struggle for the gun, and a young offender with a prior criminal record only for the offense of burglary.

As mentioned, the only evidence appellant introduced at the punishment stage of his trial were the two statements that he gave to the police concerning the murder of Brown. Defense counsel argued to the jury that appellant's statements showed that his act of shooting was not deliberate. His counsel argued that there was a struggle and a fight involved in the shooting of Brown, and "not just a mere execution." Counsel argued that the other taxicab driver, Agugua, was shot when he tried to kick the gun out of appellant's hand. In his argument, counsel made no specific mention of special issue number two in connection with rehabilitation. This is understandable given the fact there is no evidence in the record to suggest that appellant was on the road to rehabilitation at the time of his trial. In fact, just the opposite was shown by the testimony concerning appellant's conduct after his arrest, while confined in the county jail, and during his trial.

In light of the absence of any evidence or any suggestion of rehabilitation, we hold that the error by the prosecutor during voir dire in limiting the veniremembers' consideration of rehabilitation to his view of what constituted a continuing threat to society in the context of special issue number two is harmless beyond a reasonable doubt. E.g. *Williams v. State*, 622 S.W.2d 116, 119 (Tex.Cr.App.1981), in which the trial court's erroneous statements during voir dire concerning the voluntariness of a confession were rendered harmless because there was

no evidence raising the issue before the jury. Appellant's third point of error is overruled.

In another point alleging voir dire error, appellant contends that the trial court erred in overruling his challenge for cause to venireperson Edward Hill because the trial court explained the law of parole eligibility to Hill.

The trial court explained some principles of law to Hill before Hill was questioned individually by the prosecutor and defense counsel. After the court discussed the Texas capital murder scheme, including the punishment of either life or death, the following exchange occurred:

[HILL]: May I ask one thing first. A minute ago you said death or life imprisonment. Life imprisonment, you can get out in 33 years on good behavior; is that correct.

THE COURT: I do not know.

[HILL]: What if you say 99 years or one day.

THE COURT: You can't say 99 years or one day. In a capital murder case, there are only two punishments.

[HILL]: I have heard of life sentences on good behavior they can get out in 33 years.

THE COURT: I have no idea about that. Once the person goes to the penitentiary for life or for any term of years period, you become subject to the jurisdiction of the board of pardons and the penal institution and the governor insofar as when he is released. So that it is going to be up to the board of pardons and paroles and the governor. That's their jurisdiction.

There are some general guidelines that they talk about in that a person when he is sent to the penitentiary for any number of years, when he has served a third of his time or 20 years, calendar years, he is eligible for parole.[5] So what's a third of life? I don't know, you don't know. Do you understand what I am saying?

[HILL]: Yes, sir.

---

5. This case was tried before the 1987 amendments to Article 42.18, § 8(b), V.A.C.C.P., which

changed the eligibility time to one-fourth or 15 years.

THE COURT: So whenever someone has served 20 calendar years, he is eligible for parole. That doesn't mean he is going to get parole. I'm not telling you he is not going to or he is going to. It's up to the board of pardons and paroles to consider when he serves 20 calendar years. That means he is eligible. They can give him parole or not parole. As you are well aware, people have gotten out. Like you said, you have heard thirty-three and a third years. I don't know about that. But that's within their jurisdiction. So it's not to be considered by you in the assessment of punishment.

[HILL]: Yes, sir.

THE COURT: Your assessment of punishment in a capital murder case, whether it be this one or any other one, is answering those questions. In fact, you just answer the questions. I do the assessment. You know what is going to happen if you answer one of those questions. You know I'm going to have to sentence him to life in prison. If you answer all of those questions yes, you know I'm going to have to sentence him to death. So in that sense of the word you are aware of what the sentence is going to be. You see what I am saying?

[HILL]: Yes, sir.

THE COURT: But, you don't have to do the actual sentencing ... [y]ou answer the questions yes or no and I do the rest of it. Is that cleared up?

[HILL]: Yes, sir.

At this point, appellant challenged Hill for cause because the court had explained the parole eligibility law to him. Appellant argued that it was not proper for the juror to consider the parole law in a capital case. The court stated that he had made clear to Hill that parole or parole eligibility was not a proper consideration, and overruled appellant's challenge. The prosecutor then conducted his individual voir dire of Hill. He concluded his questioning of Hill by asking Hill:

[PROSECUTOR]: In the capital case, there was some conversation with you and the Judge about life and parole and things. You understand that you would not be allowed to consider that in making your judgment. If the answers are proved to you yes beyond a reasonable doubt, you must answer yes; if they are not proved yes beyond a reasonable doubt, you must answer no?

[HILL]: Yes, sir.

[PROSECUTOR]: Would you do that irregardless if he was going to get out tomorrow or Wednesday or Thursday, you would follow the law, answer the questions as the law would require you to, correct?

[HILL]: (Venireman nods head [affirmatively.])

Appellant argues that a juror who received the information about parole that Hill received should not be permitted to serve on a jury because then he knows the net effect of a life sentence is not really a life sentence.

■ Appellant is correct that the subject of parole is not a proper consideration for the jury when deliberating on punishment in a capital case. *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1981). But, this Court has also recognized that it is common knowledge that at times inmates are released on parole. Hill's questions concerning a life sentence and parole manifest the common knowledge that parole exists. Nevertheless, Hill stated to the trial judge and again to the prosecutor that he understood that parole could not be considered in deciding the punishment issues and that he would not consider it. If Hill had been shown to be unable to disregard parole in determining the punishment issues, he would have been subject to a challenge for cause by appellant. See *Felder v. State*, 758 S.W.2d 760 (Tex.Cr.App.1988). But, appellant does not point to anything in the record to contradict Hill's assertion that he would follow the law and not consider parole. Although we do not approve of the trial court's explanation to Hill of the parole law, and as presented here should not reoccur in capital murder cases, we also hold that just because the trial court discussed the parole issue with Hill does not render him subject to a challenge for cause

when Hill also stated that he would follow the law and not consider parole.

In his fifth point of error, appellant contends that the trial court erred in granting the State's challenge for cause, over his objection, to venireperson Larry Gray. Gray stated that he could not convict anyone of capital murder unless he was "a hundred percent sure" the person was guilty. Gray stated that he would require the State to prove the case beyond all doubt, not just beyond a reasonable doubt. Defense counsel rehabilitated Gray by getting his agreement that if after hearing the evidence he felt in his heart that appellant had committed the offense, not that appellant might have committed the crime or probably did it, but that Gray believed beyond a reasonable doubt that appellant committed the offense he would convict appellant. Gray agreed that he would not hold the State to a higher burden.

The prosecutor then asked Gray if he still stood by his earlier statements that he would have to be "a hundred percent sure" of a person's guilt and that the State would have to convince him beyond all doubt before he could find a person guilty of capital murder. Gray stated that he still felt the same way. The prosecutor then summed up his view of Gray's opinion, stating:

[PROSECUTOR]: Now, and again, I have no quarrel with your feelings. But let me tell you what my thinking is. My thinking is this: The law says I just have to prove it to you beyond a reasonable doubt because of Mr. Gray's feeling about the death sentence, okay, his strong moral feelings that we talked about yesterday, Mr. Gray is going to make it a little tougher on me because of his feelings. In any other case he would be okay, but in a death penalty case he's going to be a hundred percent sure beyond all doubt before he could find a man guilty in a death penalty case. That's what my thinking is. Is that what your thinking is, also?

[GRAY]: That's what my thinking is also, but like I said, you know, life or death situation involved.

. . . .

[PROSECUTOR]: Are you going to make me prove it beyond a reasonable doubt or are you going to make me prove it beyond all doubt that this is the man that did it.

[GRAY]: Beyond all doubt.

. . . .

The trial court explained to Gray that he was entitled to give his own definition to what "reasonable doubt" meant. Defense counsel questioned Gray again:

[DEFENSE COUNSEL]: Would you hold the State to a heavier burden than beyond a reasonable doubt and make them prove beyond all doubt?

[GRAY]: If it could be proven beyond all doubt.

Again the trial court discussed the issue with Gray:

THE COURT: And remember I told you that under your oath as a juror, which you have to take, that you are going to be required to follow the law?

[GRAY]: Yes.

THE COURT: And the law is that you hold the State to a burden of proof of beyond a reasonable doubt, not to anything more than that, and not to anything less than that. And we talked to you about not being the burden of proof in criminal case was not beyond all doubt or beyond a shadow of a doubt, but only beyond a reasonable doubt. And a while ago you told the prosecutor that you would, in fact, hold him to a burden of proof of beyond all doubt as opposed to just beyond a reasonable doubt. You still feel that way?

[GRAY]: Basically, yeah, my feelings are basically the same.

THE COURT: What is that?

[GRAY]: I'm morally not for the death penalty.

After further discussion in which Gray stated that he could take the juror's oath to follow the law, and that he agreed with the law in holding the State to a burden of proof beyond a reasonable doubt, the trial

court again asked Gray if he would hold the State to a higher burden of proof for a death penalty case. Gray stated that he was confused. The trial court then questioned Gray about his views against the death penalty:

THE COURT: So you feel like if you were convinced beyond a reasonable doubt that all the answers to those questions should be yes no matter what your moral convictions are, you can set those aside and answer yes to those questions knowing that guy is going to get the death penalty, they are going to kill him?

[GRAY]: Can I set it aside?

THE COURT: Yeah.

[GRAY]: I couldn't. I just be fair.

At this point the trial court granted the State's challenge for cause and appellant objected.

■■■■ The State is entitled to have a prospective juror excluded for cause if the juror has a bias or prejudice against any phase of the law upon which the State is entitled to rely. If a veniremember indicates that he would hold the State to a higher standard of proof than that of beyond a reasonable doubt, then that veniremember is subject to a challenge for cause under Article 35.16(b)(3), V.A.C.C.P. See *Wilkerson v. State*, 726 S.W.2d 542 (Tex. Cr.App.1986); *Goodman v. State*, 701 S.W.2d 850 (Tex.Cr.App.1985); and *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App. 1985). In this instance, Gray maintained that he would hold the State to a higher standard than proof beyond a reasonable doubt. Although he vacillated on this, when "pinned down," Gray consistently said that he would hold the State to a higher burden than the law required. Cf. *Franklin*, supra. The record supports the trial court's decision to sustain the State's challenge for cause. Appellant's fifth point of error is overruled.

■■■■ The record reflects that during the guilt-innocence phase of the trial the State introduced two statements made by appellant to the police in which he confessed to

shooting Brown. The State offered versions of those statements with certain parts excised in order not to be bound to prove those parts under *Palafox v. State*, 608 S.W.2d 177 (Tex.Cr.App.1980).[6] While showing the statements to G.J. Novak of the Houston Police Department, who was then testifying as a witness for the State, the prosecutor stated, "Let me show you what has been marked for identification purposes as 1A and ask if this is a true and correct copy of State's Exhibit 1, but for the parts that I have taken out, the parts that I cannot vouch for." Appellant objected that the prosecutor should not have stated in front of the jury that he could not vouch for parts of the statement. The trial court overruled the objection.

Appellant acknowledges that the prosecutor's statement was correct as a matter of law. However, he argues that the manner in which the prosecutor offered the statement was improper because it suggested to the jury that the prosecutor knew that certain portions of the statement were not true. Appellant contends that the error cannot be harmless because he received the death penalty.

The prosecutor's assertion was a correct statement of law. In fact, it implicated an area of law that both sides certainly could have discussed in voir dire because it was on a subject which the trial court could instruct the jury. See *Cole v. State*, 340 S.W.2d 45 (Tex.Cr.App.1960), and *Walker v. State*, 138 Tex.Crim. 168, 134 S.W.2d 280 (1939). No error is shown. Appellant's sixth point of error is overruled.

■■■■ In his seventh point of error, appellant contends that the trial court erred in overruling his objection to testimony elicited in front of the jury from one of the State's witnesses that appellant's confession was voluntary. James H. Binford, a 16-year veteran with the Houston Police Department, testified that on July 7, 1985, he saw appellant at the Homicide Division of the Houston Police Department while appellant was giving a statement to Officer Novack. Binford testified that he was

---

**6.** This case was tried before the effective date of the Texas Rules of Evidence, under which the

"voucher rule" no longer exists. See *Russeau v. State*, 785 S.W.2d 387 (Tex.Cr.App.1990).

seated 10 to 15 feet away from where appellant and Novack were talking and that he heard some of their conversation. Binford also testified that he observed appellant and Novack for over an hour and that Novack asked Binford to witness a statement appellant had given him.

In response to the prosecutor's question concerning Binford's view of the role of a witness to a statement, Binford stated that before he could witness a statement, it had to meet the following prerequisites: that he has to make sure the statement is voluntary, that the person giving the statement fully and intelligently understands the circumstances and the seriousness of the events, and that there is no coercion, mental, physical or in any other way. Binford described how he asked appellant to read the statement and his rights. In Binford's opinion, appellant understood his rights very well. The prosecutor then asked Binford, "And to the best of your knowledge was this statement by Johnny Ray Carter AKA Jimmy Jackson given freely and voluntarily?" The trial court overruled appellant's objection that this "invades the provenance [sic] of this Court and calls for a conclusion on the part—" Binford answered: "It was a voluntary statement. There is no doubt in my mind."

Appellant argues that the issue of voluntariness was an "ultimate issue" that was to be decided by the jury and that Binford should not have been permitted to testify to the conclusion that the statement was voluntary. Appellant states that Binford was not an expert and that allowing him to testify to such conclusion put him in the position, in the jury's view, of an expert.

The State correctly asserts that Binford's answer was no more than a shorthand rendition of the facts surrounding the circumstances of the taking of appellant's statement. See *May v. State*, 618 S.W.2d 333, 341 (Tex.Cr.App.1981), and *Brown v. State*, 561 S.W.2d 484, 489 (Tex.Cr.App.1978). In *May*, supra, at 341, we stated that it has been consistently held by this Court that

"when a lay opinion as to the mental attitude or emotional state of an accused is the mere shorthand rendering of the facts, the opinion is admissible as indicative of demeanor, subject to cross-examination as to the facts upon which it is based." [7]

The record reflects that Binford observed appellant during the taking of the statement and spoke with him afterwards to assure himself that appellant knew what he was doing. Binford's conclusory statement regarding the voluntariness was a summing up of the facts demonstrating his opinion of appellant's mental attitude and demeanor. Appellant's seventh point of error is overruled.

The record reflects that during the punishment stage of the trial, the State introduced appellant's jail record through Edward Donald Miles, a deputy sheriff with the Harris County Sheriff's Department. Miles testified that he was the classification supervisor for the classification section of the Harris County Central Jail. He also stated that he had care, custody and control of State's Exhibit No. 33, which were certain jail records that were made in the regular course of business by a person with personal knowledge of the event. Appellant objected to the introduction of the jail records on the ground that these were not the type of records contemplated by "the Business Records Act" because they contained hearsay upon hearsay and denied appellant his right to confrontation and cross-examination. The trial court overruled the objection.

Miles testified, with reference to the jail records, that appellant had been transferred to different cell blocks, including segregated cells, numerous times over the span of several months. Miles recited the reasons for some of the transfers, which included fighting and violating jail rules. Miles stated that he decided to transfer appellant to a single cell in the administrative segregation cell block because he thought appellant was a threat to the general jail population. This decision was

---

7. The Texas Rules of Evidence were not in effect at the time of appellant's trial. See, however, Tex.R.Crim.Evid. 701.

based upon the information contained in the records.

In *Smith v. State*, 676 S.W.2d 379 (Tex. Cr.App.1984), henceforth *Smith*, this Court upheld the admission of an escape report prepared by the Department of Corrections. Appellant points to language in *Smith* which states that the report recorded a concrete event and did not include speculation from anonymous sources, thus giving the report a sufficient indicia of reliability to be admissible. Appellant urges that the records in the instant case do not have that element of concreteness. He speculates that the reports may have been based upon reports from deputies as to what other inmates told them, rather than on firsthand knowledge by the deputies.

Miles testified that the records were made by people with personal knowledge of the events contained therein. Appellant's speculation that the reports were not based upon firsthand knowledge is contradicted by this testimony. The "concrete" fact showing the transfers and, in some instances, the enumerated violation which caused the violation, was specified. These reports are like those found to be admissible in *Smith*. They were made by one with personal knowledge, at or near the time of the event, and were records made in the regular course of business. The fact of the transfers and the general reason for some of those transfers are concrete events like those in *Smith*. The records were properly admitted. Appellant's eighth point of error is overruled.

In another point of error concerning the State's witness Miles, appellant contends that the trial court erred in permitting Miles to testify that in his opinion appellant would be a continuing threat to society. See special issue number 2, Art. 37.071, supra. Miles testified that based upon his observations of appellant and based upon his experience as a classification deputy within the Harris County Sheriff's Department, he believed that appellant would commit criminal acts of violence that would constitute a continuing threat to society. Appellant brought out the fact that Miles

personally saw appellant while he was in jail only about three times. However, Miles also reviewed the jail records and was the object of appellant's threats to kill him after he had testified during the trial.

Appellant argues that Miles' testimony invaded the province of the jury because Miles was not an expert on this punishment issue. Appellant notes that such testimony is permitted when a person is an "expert" in the area. Appellant posits that such an "expert" has an area of expertise beyond the everyday scope of knowledge presumed to be possessed by the jury. Appellant's examples of these kinds of "experts" are psychiatrists or mental health officials. He asserts that Miles was not an "expert" in this regard, but that because he was connected to law enforcement and dealt with classification of inmates in the county jail, the jury might accept him as more qualified than any other citizen or lay witness.

In *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980), we stated that the opinion of a former district attorney who was acquainted with the defendant's criminal record for many years, and who had actually prosecuted him for committing the offense of rape, was admissible on the subject of whether the defendant would be a continuing threat to society. We reaffirmed this proposition in *Cass v. State*, 676 S.W.2d 589 (Tex.Cr.App.1984), stating that when a lay witness is shown to be competent to testify, opinion testimony regarding special issue number two is admissible. Competence to testify means the witness has sufficient firsthand familiarity with the defendant's personal history, such as one who has a degree of personal familiarity with the defendant over an extended period of time.

Miles testified that his job was to classify jail inmates for security purposes, which included determination of whether an inmate was a high risk individual in terms of escape or probability for violence within the system. He reviewed all of the records concerning appellant's numerous transfers within the jail over a period of several months. After Miles had first testified in the instant case, appellant cursed

him and repeatedly threatened to kill him. Although Miles had not known appellant for years, given Miles' particular employment and the capacity in which he developed a familiarity with appellant over the course of several months, he certainly had a sufficient basis upon which to state his opinion regarding appellant's future dangerousness. In addition, his competence to predict such future dangerousness goes to the weight rather than to the admissibility of the evidence. *Esquivel,* 595 S.W.2d, at 528. Miles' testimony was admissible. Appellant's tenth point of error is overruled.

■ While deliberating on the punishment issues, the jury sent out a note requesting testimony of Randall Keith Adams, the officer who had arrived first on the scene, concerning what he had stated about the deceased looking as though he had been beaten severely about the head. The record does not reveal what testimony was provided to the jury in response. All that is shown in the record is appellant's objection that reading back anything other than the first sentence of what the officer said was beyond the scope of what the jury had requested.

Appellant now argues that the testimony that was read back to the jury violated Article 36.14, V.A.C.C.P., because it singled out evidence by giving the jury more than it asked for. However, as the State points out, the record does not show what part of the witness' testimony was read to the jury. There is nothing to show that the jury received more than was requested. Nothing is preserved for review. *Martin v. State,* 623 S.W.2d 391, 396 (Tex.Cr.App. 1981). Appellant's ninth point of error is overruled.

In his last point of error, appellant argues that his rights to due process and to effective assistance of counsel were violated when "defense counsel was used by inference as a prosecution witness at the punishment phase of trial."

Bobby Joe Morris testified that he was a bailiff assigned to guard appellant while he was in court. Morris stated that one day during the trial he had escorted appellant to the holdover cell near the courtroom and saw appellant speaking to Vic Pecorino, one of the two attorneys who represented appellant. Morris approached both men and saw appellant hand Pecorino a homemade knife, which Pecorino gave to Morris.

During the hearing outside of the presence of the jury regarding the admissibility of this evidence, appellant objected that such evidence denied him effective assistance of counsel because one of his attorney's was made a witness against him. The State agreed not to call Pecorino, and although Bob Hunt, co-counsel for appellant, stated that he was put in a position where he had to call Pecorino, he never did so. During argument to the jury, Pecorino commented that appellant voluntarily handed over the weapon and that people react by the way they are treated. He stated that he was not afraid of appellant.

■ It is well established that a trial court has wide discretion in admitting or excluding evidence during the punishment phase of a capital murder case. Evidence of appellant's conduct after the commission of the offense was certainly relevant to the jury's determination whether appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. Perhaps if Pecorino, appellant's counsel, had testified against appellant, or had been called to do so, a different question would be presented. But, Morris' testimony relating that appellant possessed a knife which he handed over to Pecorino, who then gave it to Morris does not implicate any participation by Pecorino in presenting the case against appellant. Nothing in Morris' testimony suggests that Pecorino was in any way involved such that his testimony was necessary or that he had become a State's witness. Nothing in the record indicates that Pecorino was "forced to wear the hat of the State." The evidence was admissible and did not render counsel's representation ineffective under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant's eleventh ground of error is overruled.

The judgment of the trial court is affirmed.

BERCHELMANN, J., concurs in the result.

CLINTON, J., disagreeing with its treatment of, inter alia, points of error numbered 1–3, joins only the judgment of the Court.

DAVIS, J., not participating.

CLINTON, Judge, dissenting on appellant's motion for rehearing.

On original submission, in a per curiam opinion, the Court addressed the merits appellant's first two points of error, alleging, respectively, that Article 37.071, V.A.C.C.P., violates the Eighth Amendment both facially and as applied to him. Appellant argued the statute was unconstitutional on its face because it allowed for imposition of the death penalty for a seventeen year old defendant such as himself. See also V.T.C.A. Penal Code, § 8.07(d). We properly disposed of this claim on original submission, invoking the decision of the United States Supreme Court in *Stanford v. Kentucky*, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), and no more need be said on that score. Appellant claimed the statute was applied unconstitutionally as to him insofar as its operation precluded jury consideration of his youth as a mitigating factor. It is this latter claim that the Court needs to reexamine.

Appellant did not assail constitutionality of the statute in the trial court. Neither did he object to the trial court's charge or request additional instructions that would have equipped the jury to give mitigating significance to his youth apart from its relevance to special issues. Without alluding to this circumstance, the Court reached the merits of appellant's claim on original submission. Since our original opinion we have decided *Black v. State*, 816 S.W.2d 350 (Tex.Cr.App.1991). In Judge Campbell's concurring opinion in *Black*, a majority of the Court expressed the view that claims predicated upon the principles adduced in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), need not be preserved in the trial court, at least if trial occurred prior to the date of that decision. See also *Selvage v. Collins*, 816 S.W.2d 390 (Tex.Cr.App.1991) (Opinion on Certified Question from the United States Court of Appeals for the Fifth Circuit). Appellant was tried in March of 1986. It is therefore appropriate to reach the merits of appellant's as-applied challenge to the constitutionality of Article 37.071, supra.

On original submission the Court disposed of appellant's claim with the following analysis:

"Although we agree with appellant that there is no express requirement within the provisions of Art. 37.071, supra, that provides for a special instruction regarding a defendant's youthful age as a mitigating factor, we also find that there is nothing within the statute that might prohibit the jury from considering a defendant's youthful age in answering the second special issue, or the probability question. See Art. 37.071(b)(2), supra. Age, however, is a factor which we find may be considered by the jury in answering the second special issue. In this instance, we decline to engraft onto Art. 37.071, supra, the requirement that a special instruction, if requested, should be given the jury regarding a defendant's youthful age."

At 23. Age may very well be a fact that has a bearing on the second special issue, concerning appellant's propensity for future dangerousness. But under *Penry*, if there is evidence that has mitigating significance, either quite apart from its relevance to special issues, or beyond whatever relevance it has to special issues, then a capital accused cannot be sentenced to death consonant with the Eighth Amendment absent some mechanism by which the sentencer is empowered to give a "reasoned moral response" to that evidence and impose a sentence less than death. 492 U.S. at 321, 328, 109 S.Ct. at 2948, 2952, 106 L.Ed.2d at 280, 284. See *Gribble v. State*, 808 S.W.2d 65, 75, (Tex.Cr.App.1990). And as I understand Supreme Court precedent, evidence of youth has constitutionally mitigating significance that transcends any relevance to Article 37.071 special issues.

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), a plurality of

the Supreme Court invalidated the death sentence of a 21 year old defendant. Under the Ohio statute then governing capital sentencing, the trial judge was to impose a sentence of death unless he found one of three statutorily defined mitigating circumstances, *viz:* 1) that the deceased "induced or facilitated" the offense, 2) that the accused acted under "duress, coercion or strong provocation[;]" or 3) that the accused's conduct was a product of his "psychosis or mental deficiency[.]" *Id.*, 438 U.S. at 607, 98 S.Ct. at 2966, 57 L.Ed.2d at 991–92. Although such factors as Lockett's age and criminal record could be considered in the determination whether any of the statutory mitigating circumstances existed, they could not be regarded as justifications in their own right for a sentence less than death. Nor could factors such as the accused's relatively minor role in the events leading up to the murder, or absence of an intent to kill on her part. A plurality of the Supreme Court held that this limitation of the range of mitigating circumstances was incompatible with its recent Eighth Amendment jurisprudence, most notably *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). In a companion case to *Lockett, Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), the same plurality overturned the death penalty of a defendant who had been sixteen years old at the time of his offense.

In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), a majority of the Supreme Court adopted the holding of *Lockett.* The Oklahoma capital sentencing statute provided for consideration of "any mitigating circumstances," and the trial judge did take Eddings' age, sixteen, into account in assessing the punishment. Thus the Supreme Court observed approvingly: "The trial judge recognized that youth must be considered a relevant mitigating factor." 455 U.S. at 115, 102 S.Ct. at 877, 71 L.Ed.2d at 11. Because the trial judge declined to consider the troubled circumstances of Eddings' upbringing, however, his death sentence was also overturned, on authority of *Lockett.*

It is true that in *Stanford v. Kentucky,* supra, the Supreme Court held it was not cruel and unusual *per se* to impose the death penalty upon defendants who were sixteen or seventeen at the time of commission of the offense. That does not mean, however, that youth has lost its constitutionally mitigating significance. In *Penry* itself the Supreme Court held it is not *per se* unconstitutional to execute a mentally retarded capital accused. But in the same opinion the Supreme Court then insisted that mental retardation has mitigating significance beyond its relevance to the special issues under Article 37.071, supra. By the same token, that the Eighth Amendment does not categorically prohibit execution of youths and young adults does not reduce the significance of youth as a circumstance that, in the individual case, might justify a sentence less than death. Youth remains as an aspect of the individual character and circumstances of the offender which is a "constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina,* 428 U.S. at 304, 96 S.Ct. at 2978, 49 L.Ed.2d at 944.

*Lockett, Bell* and *Eddings,* all supra, support the proposition that youth necessarily has Eighth Amendment relevance as mitigating evidence, quite apart from whatever bearing it may have on Article 37.071 special issues. Appellant was seventeen years old when he committed the instant offense. That fact may have relevance to special issues, just as age had some bearing upon the statutorily circumscribed mitigating factors in the Ohio capital sentencing scheme in 1978. But as was the case then in Ohio, a sentencer in Texas today must be able to consider age, in and of itself, as a justification for a sentence less than death. Jurors are entitled to believe that age has a bearing on moral culpability that transcends the particular factual questions of deliberateness, provocation and future dangerousness. Even a juror who believes beyond a reasonable doubt that a capital defendant killed deliberately and without provocation, and will likely continue to commit violent crimes, may yet judge his youth to be a valid reason to assess a penalty less than death. Appellant's jury

was not provided a mechanism by which, in its reasoned moral response to the fact of his youth, it could assess a sentence less than death—irrespective of its answers to the statutory special issues. Absent such a mechanism, his sentence of death cannot be squared with the Eighth Amendment.

For this reason, because the Court refuses to grant rehearing in this cause, and reverse the conviction and remand to the trial court under Article 44.29(c), V.A.C.C.P., I respectfully dissent.

MALONEY, J., joins.

OVERSTREET, Judge, dissenting to denial of appellant's motion for leave to file motion for rehearing.

Because of the particular circumstances and facts of this case, (1) the age of the appellant and (2) the error of the court allowing the prosecutor to limit the jurors' consideration of their beliefs on rehabilitation in answering Special Issue #2, I would grant appellant's motion for rehearing to reexamine the error complained of in point of error #3. The majority refuses, therefore, I dissent.